UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------
In re:

JOSEPH J. O'HARA,                                            Chapter 7
                                                            Case No.: 08-12108

                          Debtor.

-----------------------------------------------------------------
CLARE W. BRONFMAN and SARA
R. BRONFMAN,
                          Plaintiffs,          Adv. No.: 09-90055


DOUGLAS J. WOLINSKY, Chapter 7 trustee,
                          Intervenor,
               v.


JOSEPH J. O'HARA
                          Defendant.
-----------------------------------------------------------------
APPEARANCES:

Damon & Morey, LLP                             William F. Savino, Esq.
*Attorneys for Plaintiff*                      Beth Ann Bivona, Esq.
The Avant Building, Suite 1200                 Bernard Schenkler, Esq.
200 Delaware Avenue
Buffalo, NY 14202


Douglas J. Wolinshy, Esq.
*Chapter 7 trustee*
Primmer Piper Eggleston & Cramer PC
150 South Champlain Street
P.O. Box 1489
Burlington, VT 05401-1489


Richard Croak, Esq.
*Attorney for Debtor/Defendant*
314 Great Oaks Boulevard
Albany, NY 12203


Hon. Robert E. Littlefield, Jr., Chief United States Bankruptcy Judge


**<u>MEMORANDUM-DECISION & ORDER</u>**


1

Clare W. Bronfman and Sara R. Bronfman ("Plaintiffs") commenced the instant adversary proceeding by filing a complaint (the "Complaint") against the debtor-defendant Joseph J. O'Hara ("Defendant") seeking an order denying Defendant a discharge pursuant to 11 U.S.C. § 727(a)(2), (3), (4), and (6). Defendant filed an answer denying the Plaintiffs' allegations. After the court granted the Motion to Intervene filed by the Chapter 7 trustee ("Trustee"), Plaintiffs and the Trustee filed an Amended Complaint on September 17, 2009. The Defendant filed an answer to the Amended Complaint consisting of general denials and admissions or denials of specific factual allegations. Currently before the court are dueling motions for summary judgment as to each of the causes of action in the Complaint. On June 30, 2010, the court orally denied both parties' motions with respect to the § 727(a)(2), (4), and (6) causes of action based upon questions of fact surrounding the requisite intent of the Defendant. As to the remaining cause of action plead under § 727(a)(3), the court directed the parties to file additional memoranda of law in support of their positions and adjourned the motions for a subsequent oral decision. Based upon the evidentiary material before it, on July 16, 2010, the court orally granted Plaintiff's motion for summary judgment and denied Defendant's motion with regard to the § 727(a)(3) cause of action. This Memorandum-Decision & Order is intended to supplement the court's oral decision rendered on July 16, 2010.

## JURISDICTION

The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a), 157(b)(1), 157(b)(2)(J), and 1334.

## BACKGROUND

***Defendant's Education and Business Experience***

Defendant is an attorney admitted to practice in Washington, D.C.  Defendant's educational background is extensive.  After earning a B.A. in Economics from Holy Cross College, the Defendant attended Cornell University's Graduate School of Business and Public Administration, where he earned a M.P.A.  Thereafter, he enrolled in Cornell Law School, where he earned his J.D.

Defendant's resume reveals that he has owned and/or operated numerous business enterprises and charitable organizations. Since 1979, Defendant has held the position of officer, director, or manager for approximately two-dozen different entities.[1]  As president of several management consulting firms, Defendant was responsible "for monitoring all of the projects that [were] undertaken by [the companies'] . . . operational divisions," in addition to being "responsible for the development of new business.  (Pls.' Am. Mot. Ex. KK, at 2, ECF No. 53.)  Many of the businesses Defendant has been associated with provided financial and healthcare consulting services, as well as educational products, to governmental agencies at the state and county level and to local school districts throughout the country.  Defendant also had an interest in a real estate development company that, among other projects, aspired to develop a vineyard and hotel. (Def.'s 2004 Exam. 127:7-16, 129:8-17, Feb. 3, 2009, ECF No. 45 Ex. G.)

***Defendant's Business Transactions***

---

[1] Defendant's accountant, James Loperfido, produced a list given to him by the Defendant that indicates that Defendant owned or operated the following entities: Administrative & Financial Services, Inc.; Automated Billing Company, Inc.; Broadway Joe's of Albany, Inc.; Broadway Sports & Entertainment, Inc.; Capital District Sports and Entertainment, Inc.; Diversified Business Enterprises, Inc.; Eagle Cove Properties, LLC; Eagle Cove Vineyards & Winery, LLC; Educational Services & Products, LLC; Educational Systems & Products, LLC; The Ethical Treatment Foundation, Inc.; FREEPAC; Ideal Systems & Solutions, LLC; The Institute for Health and Human Services, Inc.; The Institute for Health and Human Services, Inc. f/k/a Tender Loving Care, Inc.; Lange & O'Hara Associates, LLC; Management Systems & Services, Inc.; Professional Assistance & Support Services, LLC; Properties Development & Management, Inc.; The O'Hara Group & Associates, Inc.; The O'Hara Group & Associates, LLC; The O'Hara Group & Associates, PLLC; Strategic Governmental Solutions, Inc. d/b/a Educational Systems & Products; and Sunshine State Billing Services, Inc.  (Loperfido 2004 Exam. 9:5-23-10:2, Feb.2, 2009, ECF No. 45 Ex. H; Pls.' Am. Mot. Ex. MM, at 2-4, ECF No. 53.)

In March 2000, Defendant founded Strategic Governmental Solutions, Inc. ("SGS").

SGS was and is wholly owned by the Defendant.  SGS developed the Student Tracking and

Reporting System ("STARS")---a proprietary software program that assists public schools in the

collection of federal reimbursements.

In an effort to market STARS to school districts across the nation, SGS employed the

marketing services of Administrative & Financial Services, Inc. ("AFS"), another business entity

founded by Defendant.   AFS recorded the SGS contract as a $1 million asset.  Following AFS's

unsuccessful marketing efforts of STARS, Defendant established Professional Administrative

Support Services, LLC ("PASS") "to isolate the [STARS] software."  (O'Hara 2004 Exam.

229:7-12, Feb. 3, 2009, ECF No. 45 Ex.G).  In 2004, SGS began doing business as Educational

Services & Products, LLC ("ESP").  SGS/ESP developed and marketed STARS at a cost of $3.7

million.  (Def.'s Suppl. Br. 8, ECF No. 109.)  Ultimately, SGS, doing business as ESP, sold the

STARS software to PASS.  SGS filed a voluntary petition for relief under Chapter 7 in this court

on April 7, 2008 (Case No. 08-11047).  Additionally, on April 30, 2008, ESP, as successor-in-

interest to SGS, filed with this court a voluntary petition for relief under Chapter 11 of the

Bankruptcy Code (Case No. 08-11400).  ESP's petition indicates that at the time of filing it had

monthly income and expenses of $250,000 and $200,000, respectively.  (Case No. 08-11400,

ECF No. 1.)

### Procedural History

Defendant filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code *pro se*

on June 30, 2008.[2]  (Case No. 08-12108 ("Main Case"), ECF No. 1.)  Defendant's counsel was

retained prior to the adversary proceeding being commenced.  Defendant's petition reveals real

estate assets of approximately $1,700,000 and personal property of $60,400+, as there were

---

[2] This court takes judicial notice of the filings regarding Defendant's underlying Chapter 7 bankruptcy case.

several items listed with a value "TBD." (*Id.*) Defendant also scheduled unsecured debts of approximately $5,642,000, unsecured priority debts of approximately $50,000, as well as secured debt of $2,254,000. (*Id.*) Plaintiffs are both listed on Schedule F of the petition as creditors holding unsecured claims in the amount of $1.25 million in connection with a "Settlement Agreement." (*Id.*)

On Schedule B of his petition, Defendant provides an itemized list of ownership interests in the following business entities: 50% ownership interest in ESP; 30% ownership interest in PASS; 100% ownership interest in Properties Development & Management, Inc.; 100% ownership interest in SGS; 100% ownership interest in The O'Hara Group & Associates, Inc.; and 100% ownership interest in The O'Hara Group & Associates, PLLC. (*Id.*) The value of the Defendant's interest in each of the business entities is listed as "TBD," and the Defendant indicated that he lacked access to "all of [the] financial records and/or tax returns for the time periods in question." (*Id.*) In response to numerous questions on his Statement of Financial Affairs ("SOFA"), the Defendant indicated that the requested information was "TO BE PROVIDED" because he lacked sufficient access to his records. (*Id.*) When Defendant did amend his schedules and SOFA, the Defendant changed many of his responses to these particular questions to "Indeterminate" or "NONE." (Main Case, ECF No. 131.)

On September 11, 2008, prior to the commencement of the instant adversary proceeding, the Plaintiffs obtained a series of orders pursuant Federal Rule of Bankruptcy Procedure 2004. (Main Case, ECF Nos. 28, 29, 30.) The orders permitted the Plaintiffs and the Trustee to subpoena documents and conduct examinations of the Defendant and third parties in order to ascertain the Defendant's financial affairs and material business transactions. One of the orders directed the Defendant to produce documents by October 10, 2008, and appear for an examination on

October 22, 2008.  (Main Case, ECF No.  28.)  While attempting to collect the requested

information from the Defendant and others,[3] the Plaintiffs and the Trustee sought several

extensions of their time to file a complaint objecting to the Defendant's discharge.

Plaintiffs deposed Defendant, Cheryl Peterson ("Peterson"), Defendant's former life-partner,

and James Loperfido ("Loperfido"), Defendant's accountant.  The Debtor's examination began

on February 3, 2009.  Prior to the examination, the Debtor had only provided limited responsive

documents to the Plaintiffs.  Plaintiffs commenced this adversary proceeding on May 26, 2009,

despite the Defendant having not fully complied with the court's September 11, 2008 order.

Plaintiffs served discovery requests in the context of the adversary proceeding on or about March

3, 2010.  (ECF No. 34.)  Defendant did not timely respond to the discovery demands.[4]  In

---

[3] More specifically, the Plaintiffs requested from the Defendant "copies of the Debtor's tax returns from 2002 through 2007; a copy of the Debtor's insurance policy (homeowner's or renter's); a copies of the Debtor's divorce decrees and/or divorce settlements which were entered between 2002 and 2008; copies of the Debtor's paychecks from January 1, 2008 to current date; a copy of the Debtor's Last Will and Testament . . .; copies of business documents (to include documents concerning the formation, ownership and purpose of businesses) and banking records from 2002 to the current date for the Debtor and the following businesses: Ideal Systems and Solution, LLC, the Institute for Health and Human Services, Inc., the Ethical Foundation,  Administrative and Financial Services, Inc., O'Hara Web Services, Service Center, Inc., IHHS, Inc., Professional Assistance and Support Services, Strategic Government Solutions, The O'Hara Group and Associates, Inc., The O'Hara Group and Associates, PLLC, The O'Hara Group and Associates, LLC, Properties Development and Management , Inc., Professional Assistance & Support Services, Inc., Strategic Government Solutions, Inc., Educational Services Products, LLC and ESP Acquisitions, Inc. and/or ESP Acquisition LLC; records and/or banking/financial documents regarding the 2006 and 2007 transfers of funds borrowed from Properties Development Management, the real estate and/or closing documents concerning the real property listed on Schedule A of the Debtor's petition; documents regarding the loan transactions with Properties Development Management; copies of real estate documents concerning the transfer of all real estate owned by the Debtor and'/or companies owned by him . . . for the past six years; a copy of the Citizens Bank, Bank of America, Adirondack Trust, Mercantile Bank and M&T Bank accounts from 2002 to current date owned by the Debtor and/or his business; a copy of the SEFCU Account from May 2008 to current; copies of the life insurance policies listed on Schedule B; copies and/or statements of the retirement account listed on Schedule B; documents and/or statements concerning the Debtor's interest in the business he owned or substantially controlled as listed on Schedule B; documents and/or statements concerning the investments listed on Schedule B; a copy of the foreclosure action commenced again the Debtor; a copy of the documents and title concerning the transfer of the 2005 Mitsubishi to Ramona Soppe and/or any other third party; a copy of the agreement with Shady Harbor Marina and copies of the documents including titles, financing agreements, etc. regarding the boat listed on Schedule B; documents relating the incomplete Schedules and Statement of Financial Affairs; and any other document relied upon by the Debtor in preparing his Schedules and Statements of Financial Affairs."   (Main Case, ECF No. 28.)

[4] The court takes judicial notice that several conferences concerning Defendant's compliance with discovery were held in this proceeding.  (*See* ECF Nos. 68, 70, 91, 93.)

response to numerous questions posed by Plaintiffs' counsel to the Defendant at his deposition

concerning personal financial statements he may have given to financial institutions, charitable

contributions, and brokerage and bank accounts he may have closed within a year of filing

bankruptcy, Defendant frequently replied that there would be records to document those things,

but failed to produce such documents or clarify who would possess such documents. (Def.'s

Dep. 11:15-14:9, April 22, 2010, ECF No. 53 Ex. R.)

The Defendant refused to answer questions posed by Plaintiffs' counsel about certain

documents that he may have authored, testifying as follows:

> Q.   I'm handing you Exhibit 5, and do you see what purports to be an e-mail
>       address for yourself?
> A.   Yes.
> Q.   And was that, in fact, your e-mail address as of the date indicated?
> A.   I'm not answering any questions concerning the document.
> Q.   Are you taking the Fifth Amendment?
> A.   I'm not answering any questions.
>               . . . .
>
> Q.   Tell me.
> A.   No, I'm not going to tell you.
>               . . . .
>
> Q.   Did you send this e-mail, which is Exhibit 5?
> A.   Let me take the words one at a time. I'm not going to answer any questions about
>       that document. Are there any of those that you don't understand?"

(Def.'s Dep. 109:14-111-15, April 22, 2010, ECF No. 53 Ex. HH.)

Defendant invoked the Fifth Amendment and refused to disclose any information

regarding his Neteller account.[5]

> Q.    . . . Would you agree with me that a portion of the money you borrowed
>       from the [Plaintiffs] was used in 2004 to pay your balance or at least a part
>       thereof at an offshore web-based gambling business?
> A.   I have been instructed not to answer any of these questions.

---

[5] Neteller is an online payment service that is frequented by internet gambling businesses and patrons. Neteller, amongst other services, allows for businesses outside of the United States to access the funds of people that reside within the United States. (Pls.' Am. Mot. Ex. RR, ECF No. 53.)

. . . .

> Q.    Mr. O'Hara, would you agree with me that roughly $150,000 of the
> money borrowed from the [Plaintiffs] transferred in transfers of roughly
> $99,000 and $51,000 respectively were moved from your personal account
> after the first of your Bronfman borrowings to the Ethical Foundation to
> replace monies that had moved from the Ethical Foundation, in part, to an
> office [sic] shore website gambling business called Net Teller?
> [Defendant's Counsel].        Objection.
> A.    You are going to reserve the right to be [sic] Fifth Amendment?
> [Defendant's Counsel].        Exactly.

(Def.'s Dep. 185:10-187:1, ECF No. 53 Ex. JJ.)

In response to Plaintiffs' counsel's inquiry as to whether Defendant possessed certain

financial documents, Defendant admits, "[t]here were lots of documents that I don't have copies

of any longer," having lost track of "a variety of records" after moving out of Peterson's house.[6]

(Def.'s 2004 Exam. 73:5-7, 75:6 , Feb. 3, 2009, ECF No. 53 Ex. X; Def.'s Aff. in Supp. Summ.

J. ¶¶ 3(a), ECF No. 48.)  Yet, when asked what documents were not returned to him, Defendant

responded, "I don't recall."  (Def.'s 2004 Exam. 73:5.)  Defendant also avers that he lost other

business records, including those that document the STARS transaction, when ESP's computers

were sold with the business.  (Def.'s 2004 Exam. 232:4-16; Def.'s Aff. in Supp. Summ. J. ¶¶

3(b).)  However, Defendant also testified that he currently maintained a laptop at his place of

business.  (Def.'s 2004 Exam. 75:14-22.)  The laptop he was using at that time was  obtained in

2008.  (Def.'s 2004 Exam. 76:5-6.)  The Defendant indicated he had not transferred any files

onto it, and he did not know what happened to the information contained on his laptop it

replaced.  (Def.'s 2004 Exam. 76:7-77:2.)

When Plaintiffs sought to examine Defendant concerning his employment in 2008, he

responded as follows:.

---

[6] In sharp contrast, Cheryl Peterson testified that Defendant had possession of every file that had been stored at her
residence. (Peterson 2004 Exam. 35:19–37:1, April 20, 2009, ECF No. 53 Ex. Y.)

Q.      Now, other than the two ESP entities, did you have any other employment in calendar year 2008?

A.      As I said, I don't know if I may have received income in 2008 through other entities.  I don't recall. There was a period of time that I was not allowed to be paid by ESP, so---the old ESP, so I don't recall how thin were being handled back then.

Q.      And do you know if there were any large transfers outside of ESP in April of 2008?

A.      I---there may will have been, because---I'm sorry, in April of 2008?

A.      I don't know.  I don't know.  I never get that involved in the --

(Def.'s 2004 Exam 143:10-144:3.)

Defendant additionally claims that since 2002, he has relied upon Loperfido to preserve his personal and business-related financial records. (Def.'s Aff. in Supp. of Opp'n ¶ 5(a)-(d), ECF No. 109.)  When Loperfido was questioned by Plaintiffs' counsel as to whether he had any information regarding the whereabouts of the AFS and PASS business transaction records, Loperfido testified that he had access to some of these records through QuickBooks.  (Loperfido cont. 2004 Exam 320:22-321:6, May 4, 2010, ECF No. 96 Ex. 10.)  Defendant explained that Loperfido installed various versions of QuickBooks on a server that was located in the location where he maintained his primary business office.  (Def.'s Aff. in Supp. of Opp'n ¶ 5(e).)  Defendant's staff would then enter information into the system.  (*Id.*)  In turn, Loperfido could access the information from his own office.  (*Id.*)  Defendant also indicated that Loperfido would send documents to him that he would mark up and return by facsimile or electronic mail. (Def.'s 2004 Exam 77:4-14, ECF No. 45 Ex  G.)  According to the Defendant, the server on which Loperfido installed QuickBooks in his office was moved, along with another server, by the purchasers of the assets of ESP.  (Def.'s Aff. in Supp. of Opp'n ¶ 5(f).)  As a result, Defendant claims he is unable to access the information that was stored on it.  (*Id.*)

Plaintiffs' motion for summary judgment was filed on April 21, 2010.  Defendant filed his

motion for summary judgment on April 22, 2010.[7]  On April 22, 2010, the Defendant also filed

copies of his late responses to admissions and answers to interrogatories.  (ECF No. 44.)

Subsequent to the motions for summary judgment being filed, Defendant sent a box of

documents to Plaintiffs' counsel in late April 2010, and an additional nine or ten boxes of

documents in or about late May 2010.  Defendant was unable to identify what was in the boxes.

(O'Hara Dep. 91:6-10, 17; 92:8-10, June 17, 2010, ECF No. 96 Ex. 3.)  On or about May 18,

2009, the Defendant was at the offices of the purchasers of ESP located in Brooklyn looking for

further responsive documents, although the Defendant indicated he had free access to the room

where the documents were located.  (May 17, 2009 Hrg. Tr., ECF No. 96 Ex. 2.)  The Defendant

was still responding to Plaintiffs' discovery requests at his continued deposition held on June 17,

2010.  (O'Hara Dep. 91:6-10, 17, June 17, 2010.)

## ARGUMENTS

Plaintiffs' position is that they are entitled to summary judgment and that Defendant should

be denied a discharge pursuant to § 727(a)(3) based on his failure to preserve documents and

comply with their discovery requests in this case.  Plaintiffs assert they were forced to obtain

records from third parties by way of subpoena.  Plaintiffs argue that Defendant's failure to

produce relevant financial records impaired their ability to ascertain the Defendant's personal

financial condition and material business transactions.  Additionally, Plaintiffs contend that

Defendant has failed to provide them with records that document: (1) the identity of the entity

---

[7] The court notes that the  Defendant's motion for summary judgment failed  to comply with Local Bankruptcy Rule
7056-1 in that it was not accompanied by a separate, short and concise statement of the material facts as to which the
movant contends there is no genuine issue, with specific citations to the record.  Although this deficiency is grounds
to deny Defendant's motion, because Plaintiffs filed their own motion and the court was desirous of resolving this
matter with both parties' positions fully before it, the court did not dismiss the Defendant's motion.  *See* LBR 7056-
1.

that owns STARS and information regarding its sale; (2) the identity of the entity that owns AFS;

(3) AFS' operations and financial records; (4) whether Defendant is owed a receivable from

PASS or AFS; (5) what appear to be inter-company transfers of monies between Defendant's

various businesses; and (6) Defendant's Neteller account.  Plaintiffs also argue that Defendant

cannot properly justify his failure to preserve material records, in light of his: (1) educational

background, business experience, and level of sophistication; (2) egregious conduct and

demeanor over the course of the instant litigation; and (3) obligation to preserve business

records, based upon the complexity of his businesses.  In addition, Plaintiffs assert Defendant's

failure to preserve his financial records was his own doing.

Defendant argues that he is entitled to summary judgment and should therefore be granted a

discharge.  Defendant contends that the documentation he supplied to the Plaintiffs was

voluminous and that he has satisfied his burden of preserving and producing records, such that

his personal and business financial conditions may be ascertained by Plaintiffs.  In support of his

motion, the Defendant indicates he produced certain tax returns, a certificate of title for an

automobile that was transferred, real estate documents concerning his properties in Saratoga and

New Baltimore and any other properties he owned between 1998-2008, documents concerning a

boat he previously owned, his divorce decree, his will, information concerning his 401(k) and

retirement account.  (Def.'s Aff. in Supp. Summ. J. ¶¶ 5-17, ECF No. 48.)  After the motions

were filed, the Defendant produced two other divorce decrees, corporate books for some of his

companies, checkbooks for two companies, some additional tax returns, two financial

statements, surveys, and a homeowner's policy for an apartment.  (Def.'s Suppl. Aff. ¶ 7, ECF

No. 66.)  In addition, Defendant asserts that he pointed the Plaintiffs to third parties that may

have had records in their possession, and the Plaintiffs admit they obtained substantial amounts

of documentation from third parties by way of subpoenas or court order.  This material allegedly

included the Defendant's bank records, credit card and financial account statements from various

financial institutions, as well as personal and business records from his accountant.  Despite this,

in response to Plaintiffs' summary judgment motion, the Defendant states that he has also

requested  the same documents and records from third parties, namely Loperfido, his banks and

financial institutions, and district court litigation counsel, which he intends to provide to

Plaintiffs' counsel.  (Def.'s Suppl. Aff. ¶ 6, ECF No. 66.)

Pleading in the alternative, Defendant asserts that if the court determines he has failed to

keep or preserve adequate records, such was justified because: (1) He was unable to access

documents left at Peterson's home, documents removed from his office by the purchasers of SGS

and ESP, and documents retained by his former landlord; (2) Defendant had reasonably relied

upon his accountant to preserve his financial records; and (3) Defendant's failure to preserve

*some* records does not impair Plaintiffs from ascertaining his personal financial condition and

material business transactions.

## DISCUSSION

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials

on file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2); Fed. R. Bankr. P.

7056.  It is the movant's burden to show that no genuine factual dispute exists.  *Vt. Teddy Bear*

*Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citation omitted).  In reviewing a

summary judgment motion, the court must resolve all ambiguities and draw all reasonable

inferences in the non-movant's favor.  *Id.*  If the moving party meets its initial burden and has

asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing

party must "set out specific facts showing a genuine issue for trial," and cannot rest "merely on

allegations or denials" of the facts asserted by the movant.  Fed. R. Civ. P. 56(e)(2); Fed. R.

Bankr. P. 7056.  Mere "conclusory statements, conjecture, or speculation by the party resisting

the motion will not defeat summary judgment."  *Kulak v. City of New York (In re Kulak)*, 88 F.3d

63, 71 (2d Cir.1996) (citations omitted).

   Chapter 7 of the Bankruptcy Code "affords powerful relief to individuals saddled with

oppressive debt by granting honest debtors a discharge from their dischargeable debts."

*Jacobowitz v. The Candle Co. (In re Jacobowitz)*, 309 B.R. 429, 435 (S.D.N.Y. 2004).  Complete

financial disclosure is a condition precedent to the privilege of a discharge.  *Ochs v. Nemes* (*In re*

*Nemes)*, 323 B.R. 316, 324 (Bankr. E.D.N.Y. 2005).

   As such, § 727(a)(3) provides that a discharge shall be denied when

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or
> preserve any recorded information, including books, documents, records, and
> papers, from which the debtor's financial condition or business transactions might
> be ascertained, unless such act or failure to act was justified under all of the
> circumstances of the case.

11 U.S.C. § 727(a)(3).  "The fundamental policy underlying § 727(a)(3) is to insure that the

trustee and the creditors receive sufficient information to effectively enable them 'to trace the

debtor's financial history, to ascertain the debtor's financial condition, and to reconstruct the

debtor's business transactions.'"  *Martin v. Key Bank of N.Y., N.A. (In re Martin)*, 208 B.R. 799,

805 (N.D.N.Y. 1997) (quoting *In re Frommann*, 153 B.R. 113, 116 (Bankr. E.D.N.Y. 1993));

*accord In re Cacioli*, 463 F.3d 229, 234 (2d Cir. 2006) ("The purpose and intent of § 727(a)(3)

 . . . is to make the privilege of discharge dependent on a true presentation of the debtor's

financial affairs.").

Consistent with the fresh start policy under the Bankruptcy Code, "exceptions to discharge must be strictly and liberally construed against the creditor and liberally construed in favor of the honest debtor." *In re Iulo*, 421 B.R. 49, 54 (Bankr. S.D.N.Y. 2009) (quoting *In re Spar*, 176 B.R. 321, 326 (Bankr. S.D.N.Y. 1994)).  A denial of a discharge under § 727(a)(3) does not require a showing of intent; only a showing that the debtor's records are not reasonable under the circumstances is necessary.  *In re Jacobowitz*, 309 B.R. 429, 440.  Whether adequate records have been kept is a case-by case determination, and the sufficiency of a debtor's record keeping is a matter of judicial discretion.  *Geltzer v. Cohen* (*In re Cohen*), Case No. 01-11748, Adv. No. 01-03570, 2007 WL 710199, at *5 (Bankr. S.D.N.Y. Mar.6, 2007) (citing *In re Joseph*, 1992 WL 96324, at *3 (N.D.N.Y. 1992)).  The more sophisticated debtor will be held to a higher standard of accountability; a debtor that engages in a series of complex business transactions will be expected to produce a greater number of and more detailed financial records.  *In re Sethi,* 250 B.R. 831, 839 (E.D.N.Y. 2000).

In determining the adequacy of the records, the courts have considers several factors, including:

> (1) whether a debtor was engaged in business and, if so, the complexity and volume of the business; (2) the amount of the debtor's obligations; (3) whether the debtor's failure to keep or preserve books and records was due to the debtor's fault; (4) the debtor's education, business experience and sophistication; (5) the customary business practices for record keeping in the debtor's type of business; (6) the degree of accuracy disclosed by the debtor's existing books and records; (7) the extent of any egregious conduct on the debtor's part; and (8) the debtor's courtroom demeanor.

*In re Sethi,* 250 B.R. 831, 838 (citing *In re Frommann,* 153 B.R. 113, 117).

A creditor objecting to a debtor's discharge under § 723(a)(3) has the initial burden to establish the following elements:

> 1. failure by the debtor to keep or preserve any recorded information, including books, documents, records and papers,
>
>     . . . .
>
> 3. *and* that by failing to keep such books or records, . . . it is impossible to ascertain the financial condition and material business transactions of the debtor.

*Gardner v. Gardner (In re Gardner)*, 384 B.R. 654, 665 (Bankr. S.D.N.Y. 2008).

Courts have acknowledged a shifting burden of production under § 727(a)(3). Initially, the creditor bears the burden of demonstrating the debtor's failure to keep and preserve any books or records from which debtor's financial condition or business transactions might be ascertained. *Id.* If the creditor successfully shows the absence of such records, the burden falls upon the debtor to rebut the proof of insufficient records, or to justify the absence of records. *In re Jacobowitz*, 390 B.R. at 436.

Debtors have a duty to preserve those records that others in similar circumstances would ordinarily keep. *Barristers Abstract Corp. v. Caulfield* (*In re Caulfield*), 192 B.R. 808, 823 (Bankr. E.D.N.Y. 1996) (citations omitted). A debtor's honest belief that he does not need to keep certain records, or that his records are sufficient, or his statement that it is not his practice to keep additional records, does not constitute justification for failure to keep or preserve records under § 727(a)(3). *In re Sethi,* 250 B.R. 831, 839 (citation omitted).

Notwithstanding this precautionary standard, it is evident that the Defendant has failed to preserve adequate records pursuant to § 727(a)(3). The Defendant is not your average wage earner. The Defendant is a sophisticated businessman with two advanced degrees from a prestigious Ivy League university, one being a law degree. A simple finding that Defendant "was engaged in business pre-petition" would be a gross understatement; the Defendant has owned or managed at least two different, multi-million dollar operations. Defendant additionally

founded, or substantially participated in, nearly two-dozen other corporate entities----two of which provided state and county-level government agencies with financial and healthcare consulting services, and another that developed an educational software product that was nationally marketed.   He was involved in numerous business ventures.  At one point he was even contemplating starting up a vineyard and a hotel.  At least two of his businesses have been involved with this court. The Defendant listed assets in excess of $1,700,000 in his petition and liabilities in excess of $7,500,000.  Thus, the Defendant is held to a higher standard in his maintenance of accurate business records than the unsophisticated wage earner.

     Defendant admits that he no longer has all of his records, but asserts that Plaintiffs were able to or could have obtained records from third parties.  Section 727(a)(3), however, does not permit a debtor to shift his responsibility onto Plaintiffs.  The fact that the Defendant can direct the Plaintiffs to where they might obtain the records does not relieve the Defendant of his responsibility to provide adequate records himself.  *In re Jacobowitz*, 309 B.R. 429, 438.  The debtor, and no one else, has an affirmative duty to provide "complete disclosure" of his financial affairs.  *In re Underhill,* 82 F.2d 258, 259-60 (2d Cir. 1936).  Creditors should not have to "'ferret out'" the required documents.  *U.S. v. Craig (In re Craig),* 252 B.R. 822, 828 (Bankr. S.D. Fla.2000) (quoting *Govaert  v. Southern Nat'l Bank of N.C. (In re Caserta),* 182 B.R. 599, 611 (Bankr. S.D. Fl. 1995)).

      It is undisputed that a number of Defendant's major business transactions remain mysteriously shrouded from this court's purview.  Defendant has admitted to not having records that document SGS/ESP's sale of STARS to PASS.  Defendant has not only failed to preserve AFS' complete financial records, but can neither evidence that AFS ever actually operated nor identify the person who, or entity that, currently owns AFS.  Defendant has alluded to several

transfers of funds among his business entities, but has no recollection or written record of them. Defendant's failure to adequately preserve his business records renders any reasonable determination of the financial condition, both personal and business, difficult---if not impossible.

Further examination of the Defendant's circumstances only reinforces this court's conclusion that the Defendant has not produced sufficient records. The accuracy of Defendant's existing records is called into question as Defendant has been unable, and sometimes unwilling, to produce underlying financial records. When asked by Plaintiffs' counsel, Defendant declined to clarify his bank records. Defendant, asserting his Fifth Amendment privilege during a deposition, refused to either confirm or deny whether he used approximately $150,000 of his borrowed funds to satisfy foreign gambling debts through Neteller. While the Defendant is permitted to assert his privilege, the court may draw an adverse inference from Defendant's refusal to testify in a civil matter. *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.E.2d 810 (1976). The Defendant also could not recall what income he may have received in 2008, what financial statements he may have given in 2008, his charitable contributions, and what brokerage and bank accounts he may have closed within a year of filing. While the Defendant indicated there must be documents to answer these questions, Plaintiffs were forced to obtain records from third parties. Such conduct falls far short of a "true presentation of the debtor's financial affairs." *In re Cacioli*, 463 F.3d 229, 234.

Finally, the Court finds Defendant's persistent unwillingness to properly abide by this court's discovery orders and Plaintiffs' discovery requests until the eleventh hour, along with his evasive and often cavalier deposition testimony, amounts to egregious conduct. This court concludes that Defendant has failed to preserve adequate records, such that a complete picture of his financial condition or business transactions cannot be ascertained.

17

At this point, the burden properly shifts to the Defendant to justify his failure to sufficiently preserve his financial records.  *Id.* at 235 (citations omitted).  Bankruptcy Courts have broad discretion in determining whether a debtor's failure to keep records is justified.  *In re Sethi*, 250 B.R. at 838.  Any legal conclusions regarding whether the debtor's failure to keep records was justified should be determined in light of the totality of the debtor's circumstances.  *Kowalski v. Kowalski (In re Kowalski)*, 316 B.R. 596, 604 (Bankr. E.D.N.Y. 2004).  When examining the debtor's circumstances, some of the relevant factors to consider are: the debtor's education and experience, the sophistication of the debtor's business, the debtor's personal financial structure, and any special circumstances that may exist.  *In re Sethi*, 250 B.R. at 838 (citing *Krohn v. Cromer (In re Cromer)*, 214 B.R. 86, 99 (Bankr. E.D.N.Y. 1997)).

Defendant admits that his failure to preserve some records can be traced back to (1) his move from his former life-partner's residence, (2) the sale of ESP's assets, and (3) his move from his prior apartment.  The Defendant has failed, however, to identify what records he maintained at his former life-partner's residence or prior apartment that are no longer available.  Likewise, the Defendant has been unable to state what materials he no longer has access to because they were stored on computers or in file cabinets sold in connection with the sale of ESP.  In addition, Defendant  has not provided any credible reason as to why these parties would hold his personal and business records hostage, nor what attempts he made to retrieve his records prior to the motions for summary judgment being filed.  "Although an individual may have every right to discard documents pertaining to his business and to decline to keep books reflecting his business transactions, if he chooses to do so he seriously jeopardizes his ability to seek shelter under Chapter 7 of the Code."  *In re Jacobowitz*, 309 B.R. at 439.

Essentially, Defendant entrusted his records to Peterson, his former landlord, and ESP's

purchaser, however, he had a level of responsibility to have access to those records when he

needed them, be it for the Internal Revenue Service, the Bankruptcy Court, shareholders, or

partners.   In addition, the Defendant's credibility as to documents he allegedly no longer had

access to is seriously undermined by his production of documents on or about June 17, 2010, that

he obtained from the purchaser of ESP.  Defendant indicated they were located in a room in the

purchaser's Brooklyn office that he always had access to.  Yet, this production was made more

than a year and a half after the court's discovery order of September 11, 2008, over three months

after Plaintiffs served discovery demands, and after both motions for summary judgment were

filed.

The Defendant also seeks to justify the deficiencies in his recordkeeping by asserting that he

had reasonably relied upon Loperfido, his accountant, to maintain a complete copy of his

financial records.  Assuming that the Defendant's testimony is true, as the court must on a

summary judgment motion, Defendant hired Loperfido to prepare his tax returns and oversee his

bookkeeping because record keeping is not one of his strengths.  Defendant asserts that

Loperfido accessed and organized his financial records using QuickBooks.  In essence, the

Defendant argues that his failure to preserve his financial records is not his fault because he had

relied upon Loperfido to perform that function.  Defendant buttresses this argument by

analogizing his circumstances to those of the debtor in *In re Cacioli*, 463 F.3d 229, wherein the

Second Circuit found that a debtor, having relied upon his partner to preserve their business's

financial records, was justified in his failure to preserve financial records.

The facts of *Cacioli*, however, are distinguishable from the case *sub judice*.  In *Cacioli*, there

was a specific business relationship between Cacioli and his business partner.  The Second

Circuit noted that "[a]s partners, Cacioli and [his business partner] share a duty to keep

partnership records." 463 F.3d at 237. The court indicated further that partners with a shared

duty often "'delegate responsibilities, including record keeping, among themselves,' and that a

partner's reliance on that delegation is relevant to justification." *Id.* (quoting *Cox v. Lansdowne*

*(In re Cox),* 904 F.2d 1399, 1403 (9th Cir.1990)).

There has been no showing that a partnership existed between Loperfido and the Defendant,

or that Loperfido had any other independent duty to maintain the Defendant's records for him.

Even if this court accepted that Defendant relied upon Loperfido to preserve a complete copy of

his financial documents, the undisputed record indicates that Defendant had reason to know that

the documents he provided to Loperfido were incomplete. Unlike Cacioli, who delegated every

step of the recordkeeping process to another person, Loperfido took direction from the

Defendant. One of Defendant's employees would electronically input data into QuickBooks,

which Loperfido could then access to complete Defendant's tax returns and financial statements.

It was Defendant who was providing information to Loperfido. Thus, Loperfido's records

chiefly consist of what Defendant had uploaded into QuickBooks.

The Defendant asserts that one failure to maintain records, referring to the business activities

of SGS, ESP, AFS, and PASS and the sale of STARS software, does not constitute a complete

failure to maintain records. This argument manifests a complete misunderstanding of both the

purpose that underlies § 727(a)(3), along with the sufficiency standard as to a debtor's records.

The underlying intent of § 727(a)(3) is to provide a mechanism by which a debtor can "make

peace with [his] creditors." *In re Kowalski*, 316 B.R. at 600. This peace is consummated when

the debtor receives a discharge from his debt(s) after providing his creditor(s) with complete and

accurate information concerning the status of his financial affairs. *See Id.* The amount of

documentation produced is not the issue.  The relevant question before the court is whether

Defendant's financial records allow the Plaintiffs to reasonably and accurately ascertain his

personal financial condition and material business transactions.  *See In re Cacioli*, 463 F.3d at

235 (citing *White v. Schoenfeld,* 117 F.2d 131, 132 (2d Cir. 1941)).

    The Defendant also argues that he has provided numerous boxes of documents to the

Plaintiffs and has obtained or is in the process of obtaining an additional set of hard copies of

documents that were already produced for the Plaintiffs pursuant to subpoena or court order from

his accountant and various financial institutions.  Plaintiffs' counsel acknowledges receiving

numerous boxes of documents after the summary judgment motions were filed.  The Defendant,

however, could not testify as to the contents of the boxes.  A debtor bears the burden of retaining

comprehensible records.  *In re Frommann*, 153 B.R. 113, 118.  Creditors should not be required

to sift through voluminous sheets of paper in order to reconstruct a debtor's financial history.

*Aid Auto Stores, Inc. v. Pimpinella (In re Pimpinella)*, 133 B.R. 694, 699 (Bankr. E.D.N.Y.

1991).  Even if the Defendant's production of documents was comprehensible, it was too little,

too late.  The Plaintiffs were already forced to subpoena records from third parties.  The fact that

the Defendant is now going to subpoena those same records evidences that Defendant did not

keep or preserve books, documents, records, and papers, from which his financial condition or

business transactions might be ascertained.

    Given the Defendant's advanced degrees in both law and public policy, his work

experience, the numerous businesses he owned and controlled, and the roles he played in his

businesses, the court finds that the Defendant's justification arguments lack merit.  Defendant's

total disclosure of his overall financial status is "a condition precedent" to this Court's granting

him a discharge from debt.  *In re Jacobowitz*, 309 B.R. 429, 435.  On the one hand, Defendant

seeks the "powerful relief" that a discharge of debt can provide; on the other hand, Defendant is

unable, or perhaps unwilling, to satisfy his end of the complete disclosure as a "quid pro quo."

*Id.*  Defendant's failure to preserve his financial records, some of which document a million

dollar business transaction, contributes to a less-than-accurate portrait of his overall financial

condition.

## <u>CONCLUSION</u>

Based upon all of the foregoing, the court grants Plaintiffs' motion for summary

judgment with respect to their § 727(a)(3) cause of action and denies the Defendant's discharge.

Defendant's motion for summary judgment is denied.

Dated:  April 18, 2011                                      /s/ Robert E. Littlefield, Jr.
                                                                         Hon. Robert E. Littlefield, Jr.
                                                                         Chief United States Bankruptcy Judge